# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**S.K.,**                          )
                                   )
    Plaintiff,               )
                                   )
    v.                       )          2:14cv1156
                                   )          **Electronic Filing**
**NORTH ALLEGHENY SCHOOL**         )
**DISTRICT**,                      )
                                   )
    Defendant.               )

## OPINION

Plaintiff commenced this civil rights action pursuant to Title IX and the Civil Rights Act seeking redress for defendant's alleged failure to remediate bullying and sexual harassment perpetrated by fellow students and its alleged retaliation against plaintiff for reporting the same. Presently before the court is defendant's motion to dismiss. For the reasons set forth below, defendant's motion will be granted in part and denied in part.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "the court [is required] to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). Under Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561 (2007), dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where the averments of the complaint fail to raise plausibly, directly or inferentially, the material elements necessary to obtain relief under a viable legal theory of recovery. Id. at 544. In other words, the allegations of the complaint must be grounded in enough of a factual basis to move the claim from the realm of mere possibility to

one that shows entitlement by presenting "a claim to relief that is plausible on its face." Id. at 570.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In contrast, pleading facts that are merely consistent with a defendant's liability is insufficient. Id. Similarly, tendering only "naked assertions" that are devoid of "further factual enhancement" falls short of presenting sufficient factual content to permit an inference that what has been presented is more than a mere possibility of misconduct. Id. at 1949–50. See also Twombly, 550 U.S. at 563 n. 8 (factual averments must sufficiently raise a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim.") (quoting Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005) & Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741 (1975)).

This is not to be understood as imposing a probability standard at the pleading stage. Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (same). Instead, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element ... [and that provides] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" Phillips, 515 F.3d at 235; see also Wilkerson v. New Media Technology Charter School Inc., 522 F.3d 315, 321 (3d Cir. 2008).

The facts read in the light most favorable to plaintiff are as follows. In the fall of 2009, S.K. ("plaintiff") was a student entering the ninth grade at North Allegheny Intermediate School

("NAI").  NAI consists entirely of ninth and tenth grade students and is part of North Allegheny School District ("defendant" or "the district").

A ritual of sophomore students hazing freshmen had developed at NAI and was well known to administrative officials and faculty.  The evening before her first day, plaintiff received the first of what would become a barrage and then pattern of threats from the older students.  The first threat came in the form of a text message from a tenth grade girl and stated: "You fucking bitch, I'm going to cut your fucking face."  Plaintiff showed the message to her older sister who sent a text message to the harasser asking why she had sent it.  In response, plaintiff received a text from another female student saying: "You just dug your grave deeper."  These threats were followed by multiple harassing posts on plaintiff's Facebook page.

The next day, the first day of school, plaintiff and her parents reported the threatening messages to the principal of NAI, Brendan Hyland.  Later that same day Hyland summoned plaintiff to his office over the school's loudspeaker.  This announcement alerted the other students to the fact that plaintiff had reported the threats.  During her visit to Hyland's office, plaintiff described the threatening Facebook posts and text messages and identified the student who was responsible, but declined to show Hyland her Facebook page.  There is no evidence that Hyland or anyone else took any action to punish or otherwise discipline the students who were identified in this initial report.

Following these events, the students who sent the initial messages continued to threaten plaintiff, both via text message and verbally.  One such verbal threat was made to plaintiff and a friend.  The student said: "I'm going to slit your throats, that's a promise not a threat."  Plaintiff and the friend reported this communication to Hyland.  Hyland's only response was to bring the student into his office to have a talk with her.  The perpetrator was not punished and was not

subjected to any disciplinary action.

As the school year progressed, the harassment spread from being initiated by female students to being initiated by male students as well and the conduct became overtly sexual in nature. Plaintiff endured verbal harassment and sexual insults by other students on a daily basis. She was called "slut" and "cunt" as she walked through the hallways and she was frequently taunted about engaging in a multitude of sexual activities. On one occasion a photograph of plaintiff was altered so that a banana could be placed in her mouth. The picture was then distributed throughout the hallways of the school. On two occasions thereafter football players threw bananas at her and loudly proclaimed that she had herpes. After each incident plaintiff reported the offensive conduct to Hyland, the guidance counselor, and teachers. Plaintiff and her parents were repeatedly assured that the superintendent was aware of the situation and the students would be disciplined.

Plaintiff physically was assaulted on multiple occasions. She was pushed, shoved, and inappropriately touched by male students in the hallways. On one occasion, a group of football players pinned her against the lockers and held her there while others grabbed at and groped her in a sexual manner. This particular assault was witnessed by a faculty member who did nothing to stop the conduct or discipline the perpetrators. The offenders were not disciplined for their conduct. None received detention, suspension from school, or suspension from participation in athletics. The student perpetrators, who were members of the football and wrestling teams, were not even confronted.

Plaintiff was subjected to escalating abuse during her lunch period. Initially she was taunted and harassed in the cafeteria. Female students refused to sit with her after witnessing the harassment she was forced to endure. She became largely exiled from the student body and

began spending her lunch period alone in the guidance counselor's office.

The harassment and bullying grew to the point where it began to permeate all aspects of plaintiff's life. Plaintiff was harassed when she attempted to attend afterschool events, like football games. In addition to the verbal harassment, male students would approach plaintiff from behind and grab or grope her as she attempted to watch the game. On at least one occasion a group of wrestlers approached her and tried to get her to go behind the bleachers and engage in sexual activities. Plaintiff received a threatening text message prior to a football game from a female student who stated that she planned to beat plaintiff with brass knuckles.

Plaintiff and her parents continued to report all of the incidents of harassment. Nevertheless, no significant measures were taken by the administration. At one point Hyland, who was also one of the school's football coaches, did suggest that if anyone bothered plaintiff at the football game(s) she should come out onto the field and get him.

Frustrated by what they perceived to be the lack of a satisfactory response from the school, plaintiff's parents filed a police report against a female student who had threatened plaintiff. The student denied sending a threatening message and claimed that her phone had been stolen and someone else had sent the message. This student later approached plaintiff in the school hallway and poured a drink on her head and physically assaulted her on multiple other occasions thereafter.

At parties outside of school, male students would attempt to isolate plaintiff and get her to engage in sexual activities. Female students spread rumors about plaintiff and attempted to instigate physical altercations with her. At one party a group of older girls convinced plaintiff to participate in a "rap battle." They then recorded her performance without her knowledge.

Plaintiff received a copy of the video and then shared it with a male student who was a

member of the wrestling team.  Plaintiff attended a basketball game and the male wrestler was present.  During the course of the night, he threw bottles at plaintiff, called her sexually charged names, and grabbed and shook her.  Plaintiff was very upset and her parents attempted to speak directly with the wrestler's parents.  The wrestler then distributed the rap video of plaintiff to the entire school.  The rap video "became an anthem of the students set on sexually harassing" plaintiff.  It was played by these students repeatedly in the halls, on the bus, and even in the classroom.  Although plaintiff and her parents asked for assistance from the district, the only advice they received was the suggestion that plaintiff transfer out of NAI.

The level of harassment grew to the point where students showed up at plaintiff's place of employment to torment and harass her.  This behavior disturbed her employer so much that he personally contacted school district officials and requested that they get the situation under control.  No students were disciplined for their behavior.

Hyland was under the impression that the students feared him and that any student engaging in misconduct "would crumble in front of him" when he confronted them.  He stated this belief to plaintiff and her parents in response to their repeated reports and complaints that the harassment and threats were continuing unabated.  By this juncture, harassing and bullying plaintiff had grown to the point where it "was its own sport."  The students were relentless in perpetuating it.  No significant or substantive punishment was imposed on the student perpetrators identified by plaintiff and her parents beyond being confronted by Hyland.  These students would feign fear and remorse to Hyland, and then brag about not getting punished to their fellow students.  Given the clear lack of repercussions after being identified, the students acted as if they could harass, humiliate, and sexually grope and assault plaintiff with impunity, which essentially had proven to be true.

The humiliation and stress caused by the relentless harassment took an emotional toll on plaintiff. She gave up attempting to report it because all her previous attempts had been in vain.

In February of 2010, plaintiff attempted to take her own life. Even after this tragic incident the students continued to make derogatory comments about plaintiff and spread rumors. These included stories about her purported death. Again, no action was taken by school officials.

At this time plaintiff's parents requested to speak directly to the school board. The superintendent then scheduled a private meeting with them and discouraged them from doing so. She assured plaintiff and her parents that she would handle the situation personally. Plaintiff provided the superintendent with a list of the offenders, but to plaintiff's knowledge no disciplinary action was ever taken against any of them.

The district officials repeated their suggestion that plaintiff transfer to another school. The school psychologist, who had never met with plaintiff, told plaintiff's parents that she had found the "perfect school." Plaintiff and her parents visited the school and discovered that it was an alternative school for troubled children. Hyland offered plaintiff a brand new laptop as a means of inducing her to transfer. Plaintiff decided to finish her freshman year at Mars School District. Her tuition was paid by the district. It presumably would not have paid the tuition if it would have been able to control and eliminate the disturbing conduct.

Following the transfer plaintiff's parents spoke to the school board about the harassment their daughter had endured and the grave consequences it produced. They spoke about their unsuccessful efforts to persuade the school officials to intervene and their frustration from the school officials' inability to do so and bring the situation under control. They emphasized the need for change.

Believing that their speech to the board would result in the district taking a more

proactive approach to bullying and sexual harassment, plaintiff's parents sent her back to NAI for her sophomore year. Plaintiff hoped that her sophomore year would be different because most of the harassers had been tenth graders and therefore had matriculated out of NAI. Unfortunately, plaintiff continued to experience harassment by her peers upon her return to NAI and the inference was raised that the administration had taken no, or at the very least, ineffective action to combat the behavior during plaintiff's absence.

Plaintiff and her parents met with school officials after it became clear that the harassment and bullying were going to continue. Those officials then explained that they had never seen bullying to this extent, and they did not know how to handle it. They seemingly admitted that they were unable to eliminate the harassment and the "discipline" that had been used appeared to be ineffective because it only fueled more of the same. They suggested that plaintiff transfer to another district. Given the bleak prospects for a normal sophomore experience at NAI, plaintiff returned to Mars.

Throughout the increasing onslaught of harassment plaintiff and her parents reported the incidents and the effect it was having on plaintiff. They complained to faculty, Hyland, the superintendent, other school officials, and the school board. The harassment continued and even escalated.

At times the harassment was witnessed by faculty. This was particularly true of the physical assaults, which took on a clear sexual overtone. Also, some of the most overt acts of sexual humiliation and innuendo, such as posting pictures of plaintiff, occurred in school hallways. Perpetrators were not held accountable for their behavior.

A number of the perpetrators were male athletes who participated in football and wrestling. These students were able to accost, grope, and mercilessly humiliate plaintiff without

consequence, even when it was witnessed by faculty. Hyland was the coach of the football team.

The "sport" of harassing plaintiff grew to the point where the police were notified and it spilled into plaintiff's private employment. School officials failed to address and control the situation even after the harassment repeatedly was brought to their attention.

Plaintiff's amended complaint purports to advance the following counts: discrimination in violation of Title IX (count one); retaliation in violation of Title IX (count two); and First Amendment retaliation and denial of equal protection under the Fourteenth Amendment pursuant to 42 U.S.C. §1983 (count three).

Defendant sets forth a multitude of reasons in support of its motion to dismiss. First, plaintiff assertedly fails to set forth a viable claim for Title IX discrimination because Hyland's actions were aimed at curtailing the harassment and the district's assistance in helping plaintiff transfer to Mars School District demonstrate as a matter of law that defendant was not deliberately indifferent to plaintiff's plight. Second, a Title IX retaliation claim has not been stated because the complaint does not identify any materially adverse action taken against plaintiff in retaliation for her attempts to seek redress through school officials. Third, a viable Monell claim is not present because the allegations do not identify a custom, practice, or policy that was implemented or sanctioned by a decision-maker with sufficient supervisory authority. Fourth, a Fourteenth Amendment Equal Protection claim has not been advanced because plaintiff has not alleged that similarly situated students from an unprotected class were treated more favorably or that plaintiff was subjected to discrimination because of her gender. Finally, defendant maintains that the complaint fails to set forth a viable claim for First Amendment retaliation because plaintiff did not engage in protected speech and there was no retaliatory conduct by defendant.

Plaintiff contends that her complaint sets forth an adequate showing of entitlement to relief on all counts. She asserts that she and her parents made defendant aware of ongoing harassment and bullying which escalated and continued unabated over a period of several months, culminating in plaintiff's attempted suicide and transfer to another school district – all of which suffices to set forth a showing that defendant was on notice that its efforts to remediate the situation were ineffective; and the continued use of those efforts reflected an unreasonable course of conduct that was deliberately indifferent to the harassment and plaintiff's rights. A retaliation claim under Title IX has been stated because defendant failed to enforce its anti-harassment policy and then insisted that plaintiff bear the consequences of the students' responses to her complaints: escalating and more intense harassment, culminating in her removal from the school district. Furthermore, school district and elected officials at a sufficient level to satisfy Monell were involved in the decisions surrounding the anemic response to the harassment, thereby establishing a policy or practice that was applicable to plaintiff. A retaliation claim under the First Amendment likewise purportedly is present because (1) plaintiff and her parents engaged in expressive activity by repeatedly making defendant aware that its remedial efforts were ineffective, (2) the school district chose to isolate plaintiff from her peers and (3) it then constructively removed her from the school district. Finally, plaintiff maintains that a selective enforcement claim under the Equal Protection Clause has been set forth because the school district chose to elevate the rights of the male athlete students by foregoing enforcement of its anti-harassment and bullying policies against them at the cost of failing to protect plaintiff's rights to an education in the district.

Plaintiff's complaint adequately pleads a discrimination claim in violation of Title IX of the Education Amendments of 1972. Title IX states in part that "no person in the United States

shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

It is settled that a funding recipient's deliberate indifference to sexual harassment of a student by another student can constitute sex discrimination under Title IX. <u>Davis v. Monroe Cnty. Bd. Of Educ.</u>, 526 U.S 629, 643 (1999). For a school district to be held liable for a claim of student-on-student sexual harassment under Title IX, a plaintiff must establish that: (1) the defendant receives federal funds; (2) sexual harassment occurred; (3) the harassment occurred under "circumstances wherein the recipient exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]," (4) the funding recipient had "actual knowledge" of the harassment; (5) the funding recipient was "deliberately indifferent" to the harassment; and (6) the harassment was "so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school." <u>Davis</u>, 526 U.S. at 645, 650.

It is undisputed that NAI receives federal financial assistance pursuant to Title IX and that plaintiff avers that sexual harassment occurred. It also is clear that the asserted harassment occurred under circumstances wherein the school district exercised substantial control over both the victim and the harassers. Most of the alleged physical harassment occurred on school property while school was in session or at school-sponsored events such as football and basketball games. And the harassment assertedly became so prevalent that it spilled into plaintiff's place of employment and an afterschool party. Thus, the first, second, third and sixth elements have been advanced with sufficient factual content.

Defendant essentially challenges the amended complaint's factual showing as it relates to the fourth and fifth elements. A school district has knowledge under Title IX if an "appropriate person" has "actual knowledge of discrimination in the recipient's programs" and/or is aware of underlying facts that actually indicate a substantial danger to its students. <u>Bostic v. Smyrna Sch. Dist.</u>, 418 F.3d 355, 361 (3d Cir. 2005). Such knowledge will be deemed to be present where the victim of the harassment reported the events to an "appropriate person" who is, at a minimum "an official of the recipient entity with authority to take corrective action to end the discrimination." <u>Gebser v. Lago Vista Ind. Sch. Dist.</u>, 524 U.S. 274, 290 (U.S. 1998).

It is sufficiently alleged that defendant had actual knowledge of the harassment. Beginning with the first day at NAI and continuing over the course of several months plaintiff and her parents made numerous reports of harassment to both Principal Hyland and the superintendent, each of whom claimed they would "handle" the situation. A school principal and a school district superintendent are appropriate school officials to whom student-on-student harassment should be reported and each is capable of taking corrective action to eliminate the inappropriate conduct. <u>Cf.</u> <u>Warren v. Reading Sch. Dist.</u>, 278 F.3d 163, 171 (3d Cir.2002) ("a school principal who is entrusted with the responsibility and authority normally associated with that position will ordinarily be 'an appropriate person' under Title IX."). Further, when plaintiff's parents advised the superintendent that they intended to raise the adequacy of the school district's response with the school board, they allegedly were deterred from doing so by the superintendent.

The amended complaint likewise sets forth a factual basis to support the deliberate indifference requirement. If a school district was in fact aware of the harassment, then the inquiry progresses to whether the district was "deliberately indifferent" toward the discriminatory

conduct.  If an agent of a funding recipient does not participate in the harassment directly, the recipient cannot be liable unless its deliberate indifference "subjects" the student to harassment. In other words, a school district's actions or inactions must at a minimum "cause [a student] to undergo" harassment or "make [him or her] liable to or vulnerable" to it.  Davis, 526 U.S. at 645.

A finding of deliberate indifference depends on the adequacy of a school district's response to the harassment.  Zeno v. Pine Plains Cent. School Dist., 702 F.3d 655, 666 (2d Cir. 2012); accord Doe v. Bellefonte Area Sch. Dist., 106 Fed. Appx. 798, 799 (3d Cir. 2004) ("The relevant inquiry for purposes of evaluating whether [a school district] was deliberately indifferent to known circumstances of harassment is to review its response to reported incidents of harassment.").  To constitute deliberate indifference, the recipient's response to the harassment must be "clearly unreasonable in light of the known circumstances."  Davis, 526 U.S. at 648.

Defendant contends that plaintiff cannot sufficiently establish that it acted with deliberate indifference because Hyland took several steps to curtail the harassment, including meeting with plaintiff, confronting a student who had sent threatening messages, providing plaintiff with sheltered access from other students, and expressing a willingness to break from his coaching role if plaintiff alerted him to harassment during a football game.  In addition, the district permitted plaintiff to transfer to another district and paid at least some of her tuition costs.

A school district's mere response to reports of unlawful harassment does not in itself defeat an assertion that it was deliberately indifferent.  Zeno, 702 F.3d at 668.  Instead, the sufficiency of the response must be viewed in accordance with the known circumstances.  Id. "And as the know circumstances change, the sufficiency of a response may also have to evolve." Id.

A reading of the complaint in accordance with the applicable standards and scope of

review indicates that defendant's "response" to the harassment consisted of two measures. First, Hyland summoned some of the perpetrators to his office and verbally confronted them. He thereafter "offered" to take the same measures as to any other students that plaintiff was willing to identify. Second, he and other school officials sought to remove plaintiff from the school environment. Plaintiff was "permitted" to spend her lunch break in the guidance counselor's office. Plaintiff likewise was encouraged and permitted to transfer to Mars School District.

These "responses" were undertaken in the following context. It is averred with sufficient factual examples that the harassment became more prevalent and severe over the course of several months. It began to encompass sexually degrading taunting and humiliation, sexual groping and grabbing and physical aggression. Although the harassment grew in intensity, none of the harassers were punished or disciplined beyond simply being spoken to by Hyland.

The failure to undertake different or additional measures where it has become apparent that the initial approach has proved to be woefully insufficient supplies a factual basis to permit a finding of deliberate indifference. As the majority in Patterson v. Hudson Area Schools opined:

> In Vance [v. Spencer County Public School District, 231 F.3d 253 (6th Cir. 2000)], . . . the district court upheld the jury verdict in favor of the plaintiff, a female student who suffered harassment over many school years perpetrated by various students, and we affirmed. Vance, 231 F.3d at 256–58. The school district responded to the plaintiff's harassment complaints by talking to the perpetrators, to no avail. Id. at 262. We rejected the defendant's argument that a school district is not deliberately indifferent "as long as a school district does something in response to harassment," id. at 260, emphasizing that "once [a school district] had knowledge that its response was inadequate, it was required to take further reasonable action in light of the circumstances to avoid new liability," id. at 262. We believe this language makes clear that, even though a school district takes some action in response to known harassment, if further harassment continues, a jury is not precluded by law from finding that the school district's response is clearly unreasonable. We cannot say that, as a matter of law, a school district is shielded from liability if that school district knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a single student. Such a situation raises a genuine issue of material fact for a jury to decide.

Patterson v. Hudson Area Schools, 551 F.3d 438, 447-48 (6th Cir. 2009). The court applied these

principles as follows:

> Here, as in <u>Theno [v. Tonganoxie Unified Sch. Dist. No. 464</u>, 377 F. Supp.2d 952 (D. Kan. 2005)], DP was repeatedly harassed over a number of years. Hudson responded to this harassment largely by giving verbal reprimands to the perpetrators. Though typically reprimands largely stopped harassment by the reprimanded student, they did not stop other students from harassing DP. This pervasive harassment escalated to criminal sexual assault. Moreover, Hudson was aware that the verbal reprimands regarding a few students were not stopping the overall harassment of DP; it is undisputed that DP continued to have problems with other students, even after some were reprimanded or even disciplined, and DP reported those continuing problems to Hudson. Br. at 8–22 (detailing DP's reported harassment).

> One key difference between <u>Theno</u> and this case is that Hudson did at one point employ a system that successfully combated the harassment of DP, i.e., the use of the resource room during eighth grade. In the instant case, a reasonable jury could thus conclude that Hudson not only was aware of what did not work, but also was aware of what had worked to insulate DP from the harassment. However, in ninth grade, Hudson discontinued the use of the resource room. The cycle of harassment then intensified, and Hudson's only response was to employ the same type of verbal reprimands that it had used unsuccessfully in response to the sixth-and seventh-grade harassment. Given that Hudson knew that its methods were ineffective, but did not change those methods, "a reasonable jury certainly could conclude that at some point during the . . . period of harassment[,] school district's standard and ineffective response to the known harassment became clearly unreasonable." <u>Theno</u>, 377 F. Supp.2d at 966.

<u>Patterson</u>, 551 F.3d at 448-49.

The scenario constructed by the instant complaint is sufficiently similar. It is alleged in an adequate factual context that defendant failed not only to eliminate the ongoing harassment of plaintiff from the school environment, but also failed to impose any type of punishment that would deter the students from perpetuating the behavior. The conduct repeatedly was reported to appropriate officials and yet it continued undeterred. It escalated to the point where it essentially was open, notorious and prevalent and became "its own sport" among certain of the school's athletes. It began to permeate plaintiff's afterschool activities to the point where plaintiff's employer was so disturbed by the behavior that he personally contacted school officials and requested that they get the situation under control. And still nothing beyond the threat of a verbal reprimand was offered or undertaken.

Against this backdrop the complaint fails to identify any meaningful measures that were undertaken by Hyland, the superintendent or any other district official after it became clear that the initial measure of a verbal reprimand by Hyland had proved to be ineffective. Hyland and the superintendent each assured that the situation would be addressed and resolved. Plaintiff's parents were dissuaded from going directly to the school board. Nevertheless, nothing was implemented to curb the escalating abuse. It follows that plaintiff has averred sufficient facts to state a claim that the district acted unreasonably in light of the circumstances and in a manner that will permit a finding of deliberate indifference.

Plaintiff has set forth a plausible showing of entitlement to relief for sexual harassment in violation of Title IX. Defendant's request to dismiss this claim will be denied.

Defendant's contention that plaintiff has failed to state a claim for retaliation under Title IX stands on different footing. Plaintiff's complaint fails to advance sufficient factual content to show that adverse action was taken against her because she complained about the school environment.

Although the statute does not specifically mention retaliation, it is settled that retaliatory conduct is within the broad prohibition of "discrimination" made unlawful by Title IX. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 174 (2005). To establish a prima facie case of retaliation, a plaintiff must show (1) that he or she engaged in protected activity; (2) defendant had knowledge of the protected activity; (3) adverse school-related action was taken against plaintiff; and (4) a causal connection between the protected activity and the adverse action. Yan v. Penn State Univ., 529 Fed. Appx. 167, 171 (3d Cir. 2013) (citing Papelino v. Albany College of Pharmacy of Union Univ., 633 F.3d 81, 91 (2d Cir. 2011)).

Plaintiff's averments easily satisfy the first and second requirements. It is asserted

throughout the complaint that she and her parents reported a number of the incidents of bullying and harassment. These complaints were made to Hyland and/or the superintendent, each of whom presumably were aware of the evolving environment and had the ability to implement corrective measures. Thus, the requisite showing has been made for the first two requirements.

Plaintiff has fallen short of meeting the third prong because the complaint does not allege specific action taken by the district that can be found to be "materially adverse" within the meaning of Title IX's prohibition against retaliation. To satisfy this requirement plaintiff must identify action that is adverse to a degree that it "might well have dissuaded a reasonable [person] from making or supporting a charge of [or complaint about] discrimination." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006); accord Dawn L. v. Greater Johnstown School Dist., 586 F. Supp.2d 332, 374 (W.D. Pa. 2008) (Applying Title VII jurisprudence to Title IX retaliation claim and recognizing that to qualify as materially adverse, retaliation must be such that it would dissuade a reasonable person from making or supporting a report of alleged harassment.); Valesky v. Aquias Academy, 2011 WL 4102584, *16 (W.D. Pa. Sept. 14, 2011) (same); E.N. v. Susquehanna Twp. School Dist., 2011 WL 3608544, at *16 (M.D. Pa. July 5, 2011) (same).

The assessment of whether particular conduct or action can be found to be retaliatory is to be undertaken with particular attention to the attendant and surrounding circumstances. Burlington Northern, 548 U.S. at 69. The examination is focused on the alleged retaliatory action and not the conduct that brought about the original claim of discrimination. Id.

Moreover, a material adverse action is one that "produces injury or harm." Burlington Northern, 548 U.S. at 67. The standard for judging whether an identified act or course of conduct is capable of producing injury or harm is an objective one. Id. And "[c]ontext matters."

Id.

Here, plaintiff asserts that Hyland's half-hearted effort to eradicate the conduct, the effects of that effort in emboldening the harassing students, and the district's subsequent efforts to persuade plaintiff to transfer to an alternative school are sufficient to support a claim of retaliation. She explains:

> the retaliatory action is the School District's insistence that S.K. bear the consequences of the student response to her complaints. Stated otherwise, the retaliatory action was the School District's decision to isolate S.K. from her peers and then remove her from the School District. [AC ¶¶ 58, 66]. The retaliation started out subtly with steps that included moving S.K.'s locker and requiring her to eat lunch with the guidance counselor. [AC ¶¶ 40, 76-77]. She also had to change her route to classes. [Id.] But then, as she made more reports, the retaliation became more severe. Immediately after her parents approached the Superintendent, Hyland and the School Psychologist attempted to induce her to attend an alternative school. [AC ¶ 50]. S.K. was repeatedly advised not to return to NAI, and eventually it was determined that S.K. would complete her education at another school district. [AC ¶¶ 57-58]. The retaliation is the exclusion of S.K. from the North Allegheny. This is an affirmative act, which is causally related to the expressive activity of S.K. and her parents.

Plaintiff's Brief in Opposition (Doc. No. 37) at p. 17-18.

Plaintiff's position that a claim of retaliation can be set forth and proven by showing the district was unable to curb the harassment and/or did not sufficiently discipline her harassers, thus subjecting her to additional harassment, is misguided. It is apparent that plaintiff can point to nothing more than the affirmative measures that defendant employed to eradicate the bullying and harassment and the ultimate failure of those measures to curb the hostility to support her claim(s) of retaliatory conduct. But the shortcomings of defendant's efforts to eliminate the sexually discriminatory environment cannot bear the weigh that plaintiff seeks to attach to them.

To show materially adverse action plaintiff advances the very conduct that forms and gave rise to her complaints of discriminatory conduct. Such circular reasoning seeks to circumvent the Supreme Court's admonishment against focusing on the original claim of

discrimination in order to assess whether an objective showing of retaliatory action has been made. Burlington Northern, 548 U.S. at 69. In other words, focusing on the student-on-student harassment and its ultimate effect on plaintiff notwithstanding the affirmative remedial action taken by defendant fails to identify any affirmative conduct that objectively can be found to be materially adverse.

Moreover, plaintiff's position seeks to circumvent the showing of intentional conduct needed to recover on a claim of retaliation. The scope of liability under Title IX is limited to the reach of its "prohibition on intentional sex discrimination." Jackson, 544 U.S. at 173. This prohibition reaches a wide array of "intentional unequal treatment." Id. at 175. It is the intentional violation of this prohibition that gives rise to a claim for money damages. Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 75 (1992). For example, a recipient's deliberate indifference to a teacher's sexual harassment of a student or a fellow student's harassment of another student are intentional acts of sexual discrimination that fall within the prohibition. Jackson, 544 U.S. at 173 (citing Gebser, 524 U.S. 290-91 and Davis v. Monroe County Bd. of Ed., 526 U.S. 629, 642 (1999)).

To be sure, retaliation taken against an individual because that individual has complained about sex discrimination is a covered form of discrimination under Title IX. Id. But "[r]etaliation is, by definition, an intentional act." Id. at 173-74. It is a form of intentional conduct because the complainant is being subjected to differential treatment. Id. at 174. It "is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." Id.

Plaintiff does not ground her claim of retaliation in a form of action that directly can be attributed to defendant; admittedly, her claim of retaliation is predicated on the consequences of

defendant's malfeasance in responding to discrimination by fellow students. But these students already had set upon perpetrating that conduct. In fact, plaintiff has averred that it was prevalent to a disturbing degree and the students who were engaging in the conduct were relentless in their efforts to perpetrate it.

Against this backdrop there is nothing in the course of defendant's response that will support a direct or inferential showing that defendant independently intended to bring about more or additional harassment by plaintiff's fellow students because she had complained about the environment or defendant's botched efforts to control it. In other words, while plaintiff has alleged and made a plausible showing that the bullying and harassment was pervasive and continued notwithstanding any efforts to eradicate it, and that conduct was perpetrated on the basis of plaintiff's sex, she has at best only made a showing that it was "possible" that defendant intentionally chose to fail in its remedial efforts in order to subject plaintiff to additional bullying and harassment for reporting the same.

It is plaintiff's burden to make a plausible showing that the identified action intentionally was implemented to cause harm or injury because complaints were made about sexual discrimination. See Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006) ("The ultimate question in any retaliation case is an intent to retaliate *vel non*."). The mere possibility that defendant intentionally failed to curb the harassment by plaintiff's fellow students falls short of the plausible showing of intentional conduct needed to identify a form of materially adverse action needed to state a claim for retaliation.

The same is true with regard to plaintiff's contention that defendant effectively forced plaintiff to transfer to another school. Bald and conclusory assertions of cause and effect simply fall short of the level of factual setting and context required to state a claim. It cannot be

questioned that plaintiff made the decision to transfer to Mars School District when defendant's efforts to control the discrimination assertedly proved to be inadequate.  But the assertion that defendant intentionally failed to gain control over the environment in order to bring about such an injury to plaintiff amounts to nothing more than unsupported speculation.  Such speculation falls short of the factual grounding needed to advance a plausible showing of entitlement to relief.

Plaintiff's attempt to anchor her retaliation claim in the framework of the hostile school environment and "constructive transfer" likewise fails to set forth a causal connection between the protected activity and the adverse action.  The first step in any assessment of a retaliation claim is to identify what conduct, if any, a reasonable jury could causally link to the existence of retaliatory animus.  See Jensen v. Potter, 435 F.3d 444, (3d Cir. 2006), overruled in part on other grounds by Burlington Northern, 548 U.S. at 68 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000); Shaner v. Synthes, 204 F.3d 494, 500-01 (3d Cir. 2000); and Aman v. Cort Furniture, 85 F.3d 1074, 1081-83 (3d Cir. 1996)).  Such animus is by its nature (1) intentional conduct aimed at inflicting injury or harm (2) taken because of a complaint about a perceived form of prohibited conduct.  And once again, there is no basis to assume or infer that defendant intended to perpetrate the student-created hostile environment in order to inflict injury or harm on plaintiff for making complaints about it.  Asserting that it did in the instant context conflates the two requirements and advances nothing more than the fallacies of formal logic known as *post hoc ergo procter hoc* and *ignoratio elenchi*.  At the very least, such logic does not supply adequate factual grounds of a causal connection between the identified protected activity and the identified materially adverse action.  It follows that it cannot support a showing of entitlement to relief for the intentional infliction of sex discrimination based on a claim of

retaliation.

In short, making a plausible showing that defendant was deliberately indifferent in preventing further harassment from students and acted unreasonably once it became clear that the measures it took to eliminate the harassment proved to be ineffective does not make a plausible showing that defendant intentionally took adverse action in order to retaliate against plaintiff for complaining about the environment. Something more than the mere statement of a claim for student-on-student sex discrimination under Title IX is required. Plaintiff has failed to supply the factual averments and context that will permit an inference that defendant harbored retaliatory animus and acted on it by engineering a particular course of additional student-based harassment. Having failed to make such a plausible showing with regard to any form of intentional adverse conduct attributable to defendant, it follows *a fortiori* that a plausible showing of a causal connection between plaintiff's complaints and the alleged forms of retaliation has not been set forth. For these reasons, plaintiff has failed to plead a plausible claim of retaliation in violation of Title IX.

Plaintiff's attempts to graft a civil rights claim out of defendant's response to the student-based sexual harassment likewise are wide of the mark. In general, § 1983 does not itself create substantive rights, but instead provides a vehicle for vindicating a violation of a federal right. Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). A cause of action under § 1983 has two elements: a plaintiff must prove (1) a violation of a right, privilege or immunity secured by the constitution and laws of the United States (2) that was committed by a person acting under color of state law. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996); Kelly v. Borough of Sayreville, 107 F.3d 1073, 1077 (3d Cir. 1997); Berg v. Cty. of Allegheny, 219 F.3d 261, 268 (3d Cir. 2000) ("The Plaintiff must demonstrate that a person acting under color of law

deprived him of a federal right.") (citing Groman, 47 F.3d at 633).

"[I]n any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998) (quoting Graham v. Connor, 490 U.S. 386, 394 (1989)).  Plaintiff seeks to set forth claims for violation of her rights guaranteed by the First and Fourteenth Amendments.  More specifically, plaintiff asserts that defendant retaliated against her for exercising her First Amendment right to comment on matters of public concern: to wit, to complain about the discriminatory environment.  And defendant failed to enforce its rules to plaintiff's detriment in violation of the Equal Protection Clause of the Fourteenth Amendment, resulting in plaintiff being subjected to additional harassment and constructively removed from the district.

Plaintiff's § 1983 claim for First Amendment retaliation suffers from the same shortcomings that preclude a claim for retaliation under Title IX.  In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action.  Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006); accord Merkle v. Upper Dublin School District, 211 F.3d 782, 793 (3d Cir. 2000) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Latessa v. New Jersey Racing Comm'n, 113 F.3d 1313, 1319 (3d Cir.1997)).

Plaintiff's complaints to defendant concerning the failure to eradicate or otherwise control the discrimination being perpetrated within the school environment seemingly are entitled to protection under the First Amendment.  See Eichenlaud v. Township of Indiana, 385 F.3d 274, 282-83 (3d Cir. 2004) ("We begin with the proposition that, except for certain narrow categories

deemed unworthy of full First Amendment protection - such as obscenity, 'fighting words' and libel - all speech is protected by the First Amendment." (quoting <u>R.A.V. v. St. Paul</u>, 505 U.S. 377, 382–90, 112 S. Ct. 2538, 120 L.Ed.2d 305 (1992))).  And First Amendment protection would be available regardless of whether the complaints on plaintiff's behalf are viewed as touching on a matter of private or public concern.  <u>Id.</u> ("That protection includes private expression not related to matters of public concern.  <u>See</u> <u>Capitol Square Review & Advisory Bd. v. Pinette</u>, 515 U.S. 753, 760, 115 S. Ct. 2440, 132 L.Ed.2d 650 (1995); <u>Connick v. Myers</u>, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L.Ed.2d 708 (1983); <u>United Mine Workers of Am. Dist. 12 v. Ill. State Bar Ass'n</u>, 389 U.S. 217, 223, 88 S. Ct. 353, 19 L.Ed.2d 426 (1967).").

Notwithstanding the protection afforded to plaintiff's speech by the First Amendment, plaintiff's attempt to plead a retaliation claim falls short because the complaint lacks facts that set forth a plausible showing that defendant took retaliatory action against plaintiff because she engaged in the expressive activity, i.e. complained about the school environment.  In other words, plaintiff's complaint fails to make a plausible showing that defendant took action or inaction with the intent to cause additional sexual harassment to be inflicted in order to punish plaintiff for complaining.  Founding the inference that defendant did so on its  inability to control the environment or its deliberate indifference to the effect the harassment had on plaintiff's rights conflates the showing needed to support a First Amendment retaliation claim with that needed to state a sex discrimination claim based on a hostile environment.  Such a showing is insufficient.

Once again, plaintiff must make a plausible showing that her reports of harassment gave rise to action by defendant that was intended to deter or punish her for making the reports.  In other words, the factual allegations must give rise to a reasonably founded expectation that discovery will reveal evidence to support the element that plaintiff's complaints were a

motivating factor in a response that was intended to punish or deter plaintiff for making the complaints. Cf. Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997) ("Under Mt. Healthy and its progeny, an otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech. This doctrine demonstrates that, at least where the First Amendment is concerned, the motives of government officials are indeed relevant, if not dispositive, when an individual's exercise of speech precedes government action affecting that individual."); accord id. at n. 13 ("an official's motive is not irrelevant when it forms an essential element of the underlying tort for which he is being sued. See Grant v. City of Pittsburgh, 98 F.3d 116, 124 (3d Cir. 1996) (citing cases in other circuits). In this case, the Virgin Islands Police Department's retaliatory motive is an essential element of Anderson's Mt. Healthy claim and is thereby relevant to any disposition of that claim, notwithstanding the doctrine of qualified immunity."). Plaintiff's complaint stops short of making such a showing and Twomby precludes her effort to further advance a First Amendment retaliation claim without that showing.

Plaintiff's attempt to set forth a plausible claim for violation of her rights under the Equal Protection Clause of the Fourteenth Amendment suffers from similar shortcomings. "Under the Fourteenth Amendment, no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" Shuman ex rel. Shertzer v. Penn Manor School Dist., 422 F.3d 141, 151 (3d Cir. 2005) (quoting U.S. Const. amend. XIV, § 1.). The Clause essentially is a directive that all persons similarly situated be treated alike. Id. (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).

The Supreme Court has recognized that Title IX was not intended "to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a

means of enforcing constitutional rights." Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 258 (2009). Indeed, the Clause reaches some activities that expressly are exempted from the purview of Title IX, such as single-sex admission policies. Id. at 257 (citing United States v. Virginia, 518 U.S. 515, 534 (1996) (men-only admissions policy at Virginia Military Institute violated the Equal Protection Clause); Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 731 (1982) (women-only admission policy at a traditionally single-sex public college violated the Equal Protection Clause). Consequently, "§ 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools." Id. at 258.

"To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." Shoemaker v. City of Lock Haven, 906 F. Supp. 230, 238 (M.D. Pa. 1995) (citations omitted); accord Shuman, 422 F.3d at 151 ("In order to bring a successful section 1983 claim for the denial of equal protection, plaintiffs must prove the existence of purposeful discrimination.") (citing Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d Cir.1990)). In other words, a plaintiff must demonstrate that he or she received different treatment from that received by other individuals similarly situated. Shuman, 422 F.3d at 151 (citing Kuhar v. Greensburg–Salem Sch. Dist., 616 F.2d 676, 677 n. 1 (3d Cir.1980)). And to prove sexual discrimination, a plaintiff must show that the identified disparate treatment was based upon his or her gender. Id. (citing Bohen v. City of East Chicago, 799 F.2d 1180, 1186–87 (7th Cir.1986)).

Plaintiff asserts that she can advance an equal protection claim that is akin to a selective enforcement claim. She highlights a line of authority recognizing that "[t]he Equal Protection Clause prohibits the 'selective enforcement' of a law based on an unjustified standard." PG

Publishing Co. v. Aichele, 705 F.3d 91, 115 (3d Cir. 2013) (quoting Thomas v. Independence

Twp., 463 F.3d 285, 296 (3d Cir. 2006). Plaintiff does not contend that the rules were enforced

against her in a selective or discriminatory manor *per se*. Instead, she argues that the refusal to

enforce the anti-harassment and anti-bullying policies against the student athletes produced a

hostile environment that was permeated with sexually degrading and humiliating conduct and

this environment deprived her of an equal educational experience. She summarizes:

> Here, S.K. alleges that the school district not only refused to enforce its harassment and
> bullying policies when it came to S.K., but did so because of her gender and because her
> harassers were male athletes. The unequal application of rules and policies for gender
> related reasons constituted the equal protection violation. The school district also tried to
> induce S.K. to go to an alternative school and then permitted the situation to degrade to the
> point that S.K. was forced to finish high school at a different school district. In essence,
> S.K. has alleged that the Defendant's (sic) elevated the interests of males, particularly male
> athletes, over her right to an education in North Allegheny. This conduct can state a
> violation of the equal protection clause similar to a selective enforcement claim.

Plaintiff's Brief in Opposition (Doc. No. 37) at 15.

Plaintiff's reliance on the prohibition against selective enforcement is unavailing. To be

sure, "it has long been established that discriminatory enforcement of a statute or law by state

and local officials is unconstitutional." Holder v. City of Allentown, 987 F.3d 188, 197 (3d Cir.

1993) (citing Cox v. Louisiana, 379 U.S. 536 (1965); Oyler v. Boles, 368 U.S. 448 (1962); Ah

Sin v. Wittman, 198 U.S. 500 (1905); and Yick Wo v. Hopkins, 118 U.S. 356 (1886)). The

underpinnings of this principle were established in Yick Wo, where "the Supreme Court laid

down the rule that a law which is 'fair on its face and impartial in its appearance' may

nonetheless constitute 'illegal discrimination between persons' 'if it is applied and administered

by public authority with an evil eye and an unequal hand.'" Id. (citing Yick Wo, 118 U.S. at

373–374).

Unconstitutional application or administration of a facially impartial law arises when an

individual acting under color of state law enforces a law "on the basis of an unjustifiable standard, such as race, or religion, or some other arbitrary factor" or when it is enforced "in order 'to prevent the exercise of a fundamental right.'" Id. (citing United States v. Schoolcraft, 879 F.2d 64, 68 (3d Cir.), cert. denied, 493 U.S. 995 (1989)).  The prior designation of a law as "mandatory" does not bar an inquiry into the motives of the public official and the protection against discriminatory enforcement applies regardless of whether the law or regulation erects a broad categorical prohibition or grants broad discretionary authority.  Id. (citing Cox v. Louisiana, 379 U.S. at 557–58 (a public official can engage "in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, . . . the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute.").

Here, plaintiff has failed to identify any disparate application of a statute, ordinance or rule to her and another individual.  Plaintiff herself was not subject to discipline or punishment pursuant to the school's anti-discrimination/bullying policies for engaging in sexual harassment or bullying.  The gravamen of her complaint is that the policies assertedly designed to protect her (as well as every other student) were not enforced against others, resulting in her being subjected to ongoing harassment and bullying.  Such a comparison fails to satisfy the basic requirement that the disparate enforcement involve an application of a common rule, ordinance or policy to similarly situated individuals.  Compare Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995) ("Plaintiffs claiming an equal protection violation must first 'identify and relate specific instances where persons situated similarly 'in all relevant aspects' were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression.") (quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989) ("appellants'

obligation was to identify and relate specific instances where persons situated similarly 'in all relevant aspects' were treated differently" which requires sufficient instances of circumstances to support a finding of facial inconsistency)) (citations omitted)); <u>Burt v. City of New York</u>, 156 F.2d 791, 792 (2d Cir. 1946) (L. Hand, J,) (The allegation that the plaintiff was victim of deliberate abuse of power by state officials is not enough; to the contrary, a claim in violation of the equal protection clause is stated where "a complaint charges a state officer, not only with deliberately misinterpreting a statute against the plaintiff, but also with purposely singling out him alone for that misinterpretation" while permitting others to escape it); <u>Albert v. Carovano</u>, 851 F.2d 561, 574 (2d Cir. 1988) ("Of course, we do not mean that exactly, rather than reasonably, comparable cases must be alleged.  However, the nature of the infraction and knowledge of the evidence by college officials must be sufficiently similar to support a finding of facial inconsistency.  Otherwise, every conclusory selective-enforcement claim would lead to discovery concerning the entire disciplinary history of a college and then to a confusing, unmanageable and ultimately incoherent retrial of every disciplinary decision, including decisions not to investigate."); <u>cf.</u> <u>Schoolcraft</u>, 879 F.2d at 68 ("To establish a claim of selective prosecution, Schoolcraft must demonstrate two factors. First, he must provide evidence that persons similarly situated have not been prosecuted.  Second, he must show that the decision to prosecute [him] was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor, or that the prosecution was intended to prevent his exercise of a fundamental right.  Schoolcraft bears the burden of proof.").   In the absence of the application of a rule, regulation or school policy being applied to plaintiff and not to others, plaintiff's allegations seek to advance a selective enforcement claim that is barred by <u>DeShaney v.</u>

Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989) and its progeny.[1]  It follows that

plaintiff cannot advance an equal protection claim predicated on the prohibition against selective

enforcement.

    Plaintiff's effort to state a claim against the district premised on the Fourteenth

Amendment's prohibition of sexual discrimination also is wide of the mark.  The Equal

Protection Clause does confer a constitutional right to be free from sex discrimination.  See, e.g.,

Hill v. Cundiff, 797 F.3d 948, 976 (11th Cir. 2015) ("Section 1983 allows persons to sue

---

[1] In DeShaney, the Court considered whether a county social services department had a
constitutional duty to protect a child from physical abuse.  For more than a year the Department
of Social Services of Winnebago County had received medical information strongly suggesting a
child was being abused by his father.  Nevertheless, the department failed to remove the child
from the home.  Eventually the father's beatings lead to brain damage and profound retardation.
The child's mother contended the department should have been or actually was aware of the
ongoing danger to the child and had a constitutional obligation to intervene on his behalf.  The
Court rejected this proposition, reasoning as follows:

    [w]hile the State may have been aware of the dangers that Joshua faced in the free
    world, it played no part in their creation, nor did it do anything to render him any more
    vulnerable to them.  That the State once took temporary custody of Joshua does not alter
    the analysis, for when it returned him to his father's custody, it placed him in no worse
    position than that in which he would have been had it not acted at all; the state does not
    become the permanent guarantor of the individual's safety by having once offered him
    shelter.  Under these circumstances, the State had no constitutional duty to protect Joshua.

DeShaney, 489 U.S. at 201.  In other words, in the absence of state-created circumstances that
render an individual less able to care for him or herself "a State's failure to protect an individual
against private violence does not constitute a violation of the Due Process Clause."  Id. at 197.
  The United States Court of Appeals for the Third Circuit has reiterated this principle on a
number of occasions.  See Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) ("a state's failure to
protect an individual against private violence does not constitute a violation of due process");
Brown v. Commonwealth of Pennsylvania Department of Health Emergency Medical Services
Training Institute, 318 F.3d 473, 476 (3d Cir. 2003) ("there is no federal constitutional right to
rescue services, competent or otherwise.").
  Most recently, the Third Circuit specifically held that school officials do not have a duty to
protect students from bullying in the form of threats, assaults and intimidation based on race,
notwithstanding the compulsory school attendance laws and the concomitant in loco parentis
authority and discretion generally exercised by school officials.  Morrow v. Balaski, 719 F.3d
160, 172-73 (3d Cir. 2013) (en banc).  This holding extends with equal force to the one-sided
selective enforcement claim which plaintiff has advanced under the Equal Protection Clause.

individuals or municipalities acting under the color of state law for violations of federal law. One such law is the Equal Protection Clause, U.S. Const. amend. XIV, § 1, which confers a federal constitutional right to be free from sex discrimination.") (citing <u>Personnel Adm'r of Massachusetts v. Feeney</u>, 442 U.S. 256, 273 (1979) (disparate impact may be used as circumstantial evidence in an effort to prove invidious gender discrimination in violation of the Equal Protection Clause)). And this right includes the right to be free from sexual harassment perpetrated by government officials in a public school. <u>K.S. v. Detroit Public Schools</u>, 2015 WL 4459340, *11 (E.D. Mich. July 21, 2015) (citing <u>Poe v. Haydon</u>, 853 F.2d 418, 429 (6th Cir. 1988) ("sexual harassment by government employers would violate the rights protected by the equal protection clause"); <u>accord</u> <u>T.E. v. Grindle</u>, 599 F.3d 583, 587 (7th Cir. 2010) ("sexual abuse by a teacher can deprive a student of his or her right to equal protection under the law").

Although both Title IX and the Equal Protection Clause protect against sexual harassment in the school environment, their respective applications do not necessarily produce parallel or even consistent results. <u>Hill</u>, 797 F.3d at 976. To the contrary, "Title IX and § 1983 are different [and] [a]s the Supreme Court has said, Title IX's and § 1983's protections 'are narrower in some respects and broader in others.'" <u>Id.</u> (citing <u>Fitzgerald</u>, 555 U.S. at 256). In this regard Title IX protects against sexual harassment within institutions and programs that receive federal funds; it does not authorize suits against individuals. <u>Id.</u> at 977 (citing <u>Fitzgerald</u>, 555 U.S. at 257). "Section 1983 equal protection claims, by contrast, may be brought against individuals and municipalities." <u>Id.</u>

The standards for establishing liability under Title IX and § 1983 are not wholly congruent. <u>Id.</u> (citing <u>Fitzgerald</u>, 555 U.S. at 257). Under Title IX, school district liability can be established "by showing an appropriate school official responded to sexual harassment with

deliberate indifference." <u>Id.</u> "A plaintiff stating a similar claim via § 1983 for violation of the

Equal Protection Clause by a school district . . . must" meet the requirements needed to establish

municipal liability under <u>Monell v. New York City Dept. of Social Servs.</u>, 436 U.S. 658, 694

(1978) and its progeny. <u>Frizgerald</u>, 555 U.S. at 257; <u>accord Hill</u>, 797 F.3d at 977 (same).

 In <u>Monell</u>, the Supreme Court held that "[a] municipality or other local government may

be liable under § 1983 if the governmental body itself 'subjects' a person to a deprivation of

rights or 'causes' a person 'to be subjected' to such deprivation." <u>Connick v. Thompson</u>, 536 U.S.

51, 60 (2011) (quoting <u>Monell</u>, 436 U.S. at 692). However, such entities "are responsible only

for 'their own illegal acts' [and] are not vicariously liable for the acts of their employees." <u>Id.</u>

(quoting <u>Pembaur v. Cincinnati</u>, 475 U.S. 469, 479 (1986)). In other words, liability against such

an entity may not be established by the *respondeat superior* doctrine, but instead must be

founded upon evidence indicating the government itself supported a violation of the plaintiff's

constitutional rights. <u>Monell</u>, 436 U.S. at 694; <u>see</u> <u>also</u> <u>Bielevicz v. Dubinon</u>, 915 F.3d 845, 849-

50 (3d Cir. 1990) ("municipal liability attaches only when 'execution of a government's policy

or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury.'") (quoting <u>Monell</u>, 436 U.S. at 694).

 In order to establish municipal liability a plaintiff must prove that "action pursuant to

official municipal policy caused the deprivation" of a federal right. <u>Connick</u>, 536 U.S. at 60

(quoting Monell, 436 U.S. at 691). Official municipal policy includes formal policy, acts of

official policymakers and "practices so persistent and widespread as to have the force of law."

<u>Id.</u> (collecting cases); <u>accord Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 263 (3d Cir. 2010) (To

rise to the level of a policy, a custom or practice must be "so permanent and well settled as to

virtually constitute law."). "These are 'actions for which the municipality is actually

responsible.'"  Connick, 563 U.S. at 61 (quoting Pembaur, 475 U.S. at 479-80).

Proving a government policy or custom can be accomplished in a number of ways. Bielevicz, 915 F.2d at 850.  "Policy is made when a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict."  Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur, 475 U.S. at 481).  Custom, in contrast, can be proven by demonstrating that a given course of conduct, although not specifically endorsed or authorized by state or local law, is so well-settled and permanent as virtually to constitute law.  Id. (citing Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir.) ("Custom may be established by proof of knowledge and acquiescence."), cert. denied, 42 U.S. 919 (1989)).

Here, plaintiff has alleged that the school environment was permeated with sexual harassment to the degree that harassing her had become its own sport.  But knowledge of this state of affairs is by plaintiff's own allegations limited to Hyland and the superintendent of the district.  Predicating liability solely on the knowledge and inactions of these individuals would be nothing more than a thinly veiled application of vicarious liability pursuant to the *respondeat superior* doctrine.  Liability against defendant cannot proceed on this basis.

Beyond referencing the "knowledge" of the environment and by inference Hyland's inability to eradicate the treatment of plaintiff by her fellow students, plaintiff identifies two "executive" policies to support the imposition of Monell liability.  First, defendant "effectively decided that [plaintiff] would not be offered an education in the North Allegheny School District that was equivalent to the education it offered to other students."  Plaintiff's Brief in Opposition (Doc. No. 37) at 19.  Second, each of the measures implemented in an effort to separate plaintiff from her harassers was a policy decision that denied plaintiff equal protection and retaliated

against her for complaining about the environment.  Id.  In other words, from plaintiff's

perspective "it became the policy of North Allegheny to punish the victim, and allow the

harassers to retain all the privileges and rights that should have been available to [plaintiff]."  Id.

These identified "policies" are not proper grounds for advancing a claim at the pleading

stage.  As the Third Circuit recently reiterated, in reviewing the sufficiency of a complaint

pursuant to a motion to dismiss, a court is to "identify those allegations that, being merely

conclusory, are not entitled to the presumption of truth."  Connelly v. Lane Construction Corp.,

809 F.3d 780, 789 (3d Cir. 2016).  A distinction is to be drawn "between legal conclusions,

which are discounted in the analysis, and allegations of historical fact, which are assumed to be

true even if 'unrealistic or nonsensical,' 'chimerical,' or 'extravagantly fanciful.'"  Id. (citing Iqbal,

556 U.S. at 681).  In other words, outlandish allegations of historical fact are entitled to "a

presumption of truth except to the extent they resembled a 'formulaic recitation of the elements

of a . . . claim' or other legal conclusion."  Id. at 790.

Here, the assertion that defendant decided not to offer plaintiff an equal opportunity for

an education, had a discriminatory motive in implementing each measure taken to shelter

plaintiff from the harassment and "adopted a policy" to punish the victim rather than the

harassers are mere conclusions of law.   Consequently, the identified "policies" are not entitled to

a presumption of truth.  Cf. id. (Of course, "the clearest indication that that an allegation is

conclusory and unworthy of weight in analyzing the sufficiency of a complaint is that it

embodies a legal point.") (citing Peñalbert–Rosa v. Fortuño–Burset, 631 F.3d 592, 595 (1st Cir.

2011)).

Plaintiff does allege as historical fact that her parents became so frustrated with Hyland

and the superintendent's failure to eradicate the harassment and bullying that they appeared at a

school board meeting after plaintiff left NAI in her freshman year and gave an impassioned speech that outlined the harassment that had occurred and the effects it had on plaintiff. They raised their unsuccessful efforts to persuade school officials to intervene and stop the harassment and emphasized the need for change. Believing this public remonstration would cause school officials to become more proactive, plaintiff and her parents then made the decision to permit plaintiff to return for her sophomore year. As noted above, the harassment and bullying continued unabated.

Plaintiff has alleged that through the impassioned speech the board became aware that Hyland and other school officials had not intervened on plaintiff's behalf to a degree necessary to eradicate the student-based harassment and bullying. It also became aware that plaintiff's parents believed that a more proactive approach at NAI was needed to stifle this behavior in relation to the manner in which it had been perpetrated against plaintiff.

The inference is thus raised that the board became aware that the anti-harassment and bullying policies as administered at NAI had proven ineffective with regard to the specific treatment of plaintiff by her fellow students. In addition, the board became aware that plaintiff's parents believed that implementing a more proactive approach was necessary to change the atmosphere and climate in which the harassment and bullying had flourished. The inference also is raised that the board did not take any further action based the information conveyed in the impassioned speech.

The above referenced facts and inferences fail to identify an official declaration, proclamation or edict that was adopted by the board. Through these allegations plaintiff does not challenge the facial validity of NIA's anti-discrimination/bullying policy. Thus, an act adopting or setting forth an official policy by the board has not been identified.

Plaintiff likewise has failed to aver facts that would support a finding of the existence of a custom or policy. Such informal practices must be so wide-spread, persistent and well-settled as to constitute a virtual reflection of law. The inability to control the harassment and bullying perpetrated on plaintiff, as persistent and routine as it was, reflects the averment of a tragic scenario involving one student and thus lacks the permanency, uniformity and broad application inherent in a municipal custom or practice that has assumed the force of law.

Assuming for the sake of argument that plaintiff is attempting to advance a "policy" or "custom" predicated on the board's failure to take action after the impassioned speech, the amended complaint still fails to set forth a claim for municipal liability. In this regard "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." Hill, 797 F.3d at 977 (quoting Bd. of Cty. Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 404 (1997). To be entitled to recovery it also must be shown "that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Bryan County, 520 U.S. at 404; Hill, 797 F.3d at 977.

Plaintiff has failed to make a plausible showing that the asserted failure of the board to take some measure such as changing its existing anti-harassment/bullying policy and/or mandating the implementation of a more proactive approach in administering the same amounted to deliberate indifference that was an independent cause of the ongoing harassment and plaintiff's subsequent transfer from NAI. As an initial matter, plaintiff's allegations of a "policy" being implemented by the board are anchored in a contention that it failed to act in response to the impassioned speech. The Third Circuit repeatedly has declined to permit claims to proceed

where they are founded on a failure to act. See Young v. Pleasant Valley School Dist., 2012 WL
1827194, * 6 (M.D. Pa. May 18, 2012) (Kane, J.) ("The Third Circuit has held that 'failures to act
cannot form the basis of a valid Section 1983 claim.'") (quoting Kaucher v. County of Bucks,
455 F.3d 418, 433 n. 11 (3d Cir. 2006) (collecting cases)); accord D.R. by L.R. v. Middle Bucks
Area Vocational Technical School, 972 F.2d 1364, 1376 (3d Cir. 1992) (affirming dismissal of
municipal liability claim predicated on failure to intervene or otherwise take appropriate action
to curb physical, verbal and sexual harassment/abuse of student perpetrated by fellow students –
"§ 1983 liability may not be predicated upon a Stoneking [v. Bradford Area School District, 882
F.2d 720, 725 (3d Cir.1989), cert. denied, 493 U.S. 1044 (1990)] type theory because private
actors committed the underlying violative acts.").

   In addition, plaintiff has failed to provide sufficient factual allegations to raise a
reasonably founded hope that discovery will provide evidence to support the elements of
deliberate indifference and causation against the district. "'Deliberate indifference' is a stringent
standard of fault, requiring proof that the municipal actor disregarded a known or obvious
consequence of his action." Connick, 131 S.Ct. at 1359 (quoting Bryan County, 520 U.S. at
410). Municipal policymakers are required to be on actual or constructive notice that a particular
omission in the entity's training or approach is causing employees to violate citizens'
constitutional rights. Id. at 1360 (citing Bryan County, 520 U.S. at 410). It is the decision not to
change course after gaining such notice that propels the adherence to the chosen course of action,
in effect a "policy of inaction," to the "functional equivalent of a decision by the [policymakers]
to violate the Constitution." Id. (quoting Canton, 489 U.S. at 395 (O'Connor, J., concurring in
part and dissenting in part)). In other words, "[p]olicymakers' 'continued adherence to an
approach that they know or should know has failed to prevent tortious conduct by employees

may establish the conscious disregard for the consequences of their action — the 'deliberate indifference' — necessary to trigger municipal liability." Id. (quoting Bryan County, 520 U.S. at 407). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[2] Id.

Plaintiff's contention that defendant made a conscious choice to have her bear the brunt of the harassment in order to punish her and convince her to transfer from the district is at best ungrounded speculation. The impassioned speech was given after plaintiff had transferred to Mars School District in her freshman year. The notion that the board was placed in a situation where it had to make a conscious choice among varying alternatives at that point, one of which involved a significant risk of violating plaintiff's or other student's constitutional rights, is conjecture. Such speculation and conjecture fall short of the showing needed to proceed.

The same is true with regard to the factual underpinnings of the board's knowledge about the potential for ongoing harassment and/or bullying when plaintiff made the decision to return to NAI at the beginning of her sophomore year. To the contrary, the proposition that plaintiff's mere return to the district without more demonstrated to the board that her rights would be further violated is belied by plaintiff's parents' belief that the harassment would be less than systematic and pervasive due to a change in school officials' attitudes engendered by the speech and the matriculation of the upper classmen.

Moreover, even giving plaintiff the benefit of all doubt, the impassioned speech did not

_____

[2] Requiring a less stringent standard would result in "*de facto respondeat superior* liability on municipalities." Id. (quoting Canton, 489 U.S. at 392 and citing Pembaur v. Cincinnati, 475 U.S. 469, 483 (1986) (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials …")).

provide grounds to believe the board would have had knowledge that the failure to implement a more proactive anti-harassment and bullying policy would constitute a violation of plaintiff's constitutional rights. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. (quoting Bryan County, 520 U.S. at 409). This can be done by presenting evidence of similar constitutional violations by employees of which the policymaker was or should have been aware. Id. at 1360-61. The violations must be of sufficient similarity to impute notice of an actual pattern; mere notice of multiple violations of a constitutional right in differing ways will not suffice. Id. at 1360.

Plaintiff's allegations are limited to the harassment perpetrated against her and fail to identify any basis for assuming that the board was aware of instances where student-initiated harassment or bullying perpetrated on other students was not controlled by the existing school officials and/or NAI's established policies and practices in dealing with such conduct. Accordingly, the amended complaint fails to set forth a factual showing that supports the elements of deliberate indifference and causation as to plaintiff's § 1983 municipal liability claim and this claim must be dismissed for these reasons as well.

Plaintiff's amended complaint fails to set forth a sufficient factual setting to identify the existence of a municipal policy or custom that can give rise to § 1983 liability. Consequently, plaintiff cannot proceed against defendant on a municipal liability claim for violation of equal protection predicated on sexual harassment.

For the reasons set forth above, defendant's motion to dismiss will be denied as to plaintiff's claim for sexual harassment in violation of Title IX and granted in all other aspects.

An appropriate order will follow.

Date: March 2, 2016

                                              s/David Stewart Cercone
                                              David Stewart Cercone
                                              United States District Judge


cc:     Edward A. Olds, Esquire
        Jaimie L. George, Esquire
        Alfred C. Maiello, Esquire
        Gary H. Dadamo, Esquire
        Michael L. Brungo, Esquire
        Roger W. Foley, Jr., Esquire

        (*Via CM/ECF Electronic Mail*)